UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| CITY OF ROCK ISLAND, an Illinois municipal corporation, and VILLAGE OF MILAN, an Illinois municipal corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF THE ARMY, CORPS OF ENGINEERS, and LIEUTENANT GENERAL THOMAS P. BOSTICK, Chief of Engineers, sued in his official capacity only,<br><br>        Defendants. | Case No. 4:13-cv-04047-SLD-JEH |

## ORDER

Plaintiff Cities of Rock Island and Milan seek preliminary and permanent injunctions against Defendants United States of America, Army Corps of Engineers, and Lieutenant General Thomas P. Bostick (collectively, "the Corps") under the federal facilities provision of the Clean Water Act ("CWA"), 33 U.S.C. § 1323(a), the citizen suit provision of the CWA, 33 U.S.C. § 1365, the federal facilities provision of the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300j-6(a)(2), and the citizen suit provision of the SDWA, 42 U.S.C. § 300j-8. Plaintiffs ask that the Corps be permanently enjoined to maintain the Mill Creek South Slough, where it has periodically operated a flood control project. The Corps now moves to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), and, alternatively, moves for a judgment on the pleadings pursuant to Rule 12(c). Defs.' Mot. Dismiss, ECF No.

10. For the following reasons, Defendants' Motion to Dismiss, or, Alternatively, for Judgment on the Pleadings, ECF No. 10, is GRANTED.

## BACKGROUND[1]

The federal government built the Illinois and Mississippi Canal in 1895. The canal blocked the connection of Mill Creek, near Milan, to the Rock River. Mill Creek was diverted to connect instead to the South Slough. In response to flooding in Milan between 1895 and 1929, Congress authorized the Mill Creek South Slough Project ("MCSS Project"), which abated flooding in Milan by: constructing spillways where Mill Creek used to run into the Rock River; placing levees on both sides of Mill Creek; and dredging and realigning both Mill Creek and the South Slough, where a new channel, which ran more directly to the Mississippi River than its predecessor, was cut. In order to make these improvements, the Corps acquired real estate easements and property in an area extending both upstream and downstream from the former mouth of Mill Creek.

In 1951, the Illinois and Mississippi Canal was closed, and in 1963 the Corps diverted Mill Creek back to its original outlet into the Rock River. The Corps continued to maintain the levees and channels in the MCSS Project, however, because they were needed to manage the risk of flooding in Milan. In 1984, the Corps ceased regular maintenance of the MCSS Project, and in 1987, completed and turned over to the City of Milan a new comprehensive flood risk management project, the Local Flood Prevention Project ("LFPP"). The South Slough, the new MCSS channel, and the creeks that feed it were dredged to manage the risk of flooding in nearby residential areas of Milan. The Corps retains its real estate interests and operational authority for

---

[1] In a motion to dismiss, all well-pleaded allegations in the complaint are taken as true and viewed in the light most favorable to the plaintiff. *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (citation omitted). Accordingly, the material set forth here is based on allegations in the Complaint, ECF No. 1, and the Exhibits appended thereto. *See Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1998) (stating that "the district court is entitled to consider exhibits attached to the complaint as part of the pleadings").

the MCSS Project to the present day. Maintenance actions performed by the Corps in the past on the MCSS Project have included "clearing," "snagging," and dredging.[2]

The levees operated by the City of Milan along the banks of Mill Creek have gates that close when the water level of Mill Creek is high, and when it is not, remain open to permit drainage of runoff from the City of Milan. The water level of Mill Creek has risen, however, requiring that the city keep the levee gates shut, which causes the impounded runoff to run into the City's sanitary sewers. Plaintiffs maintain that such "[i]nflow or infiltration of the impounded runoff water into the Milan sanitary sewer going to the Milan [Sewage Treatment Plant, ("STP")] will likely hydraulically overload it and cause it to discharge inadequately treated sewage into the Rock River . . . ." Compl. ¶32. Such sewage would be harmful to the environment. The emission of inadequately treated sewage would also cause the Milan STP to violate its National Pollutant Discharge Elimination System ("NPDES") permit for the emission of effluent.

When the Mississippi River floods, the water level in the South Slough rises. When the floodwater recedes into the Mississippi River, it does so through the old slough channel and the MCSS Project channel. Receding floodwaters leave behind debris and sediment in these channels, impeding their ability to drain water back into the Mississippi River and causing water levels in the South Slough to rise. Water has ponded in regions of the Milan LFPP, hindering its ability to prevent flooding. Water has also ponded over a concrete pipe, the Southwest Interceptor, owned and operated by the City of Rock Island. The line carries wastewater from Rock Island to the Rock Island Southwest Sewage Treatment Plant ("Southwest STP"), which

---

[2] According to the Complaint, "clearing and snagging" involves removing woody debris from the channel, such as downed trees and beaver dams." Compl., Ex. D at 17.

discharges, pursuant to an NPDES permit, into Mill Creek.[3] The ponding has submerged 1,245 linear feet of the Southwest Interceptor, which, Plaintiffs claim, has resulted in the "likelihood" that there will be a break in the Interceptor. Compl. ¶ 44. This would lead to various possible pollution scenarios, including an "open rupture," which would release "approximately 400,000 gallons of raw sewage into the water around the line break per day." *Id.* Alternatively, Plaintiffs maintain, the Southwest Interceptor "may collapse in on itself," which "would cause a back-up resulting in upstream overflows." *Id.* ¶ 46. Such ruptures would require repair, and result in Rock Island's STP violating the terms of its NPDES effluent emission permit.

Approximately two miles of Rock Island's municipal water main are also submerged. There is a "likelihood" that there will be a break along this water main, resulting in contamination of the water in the main, shutoff of the main while repairs are performed, and interruption of sanitary sewer service in the area. Compl. ¶ 105.

In 2009, Congress authorized $482,000 for operation and maintenance of the MCSS Project. In 2011, drawing from these funds, the Corps undertook a one-time action to ameliorate high water conditions in the Mill Creek, lowering the water level to the point "where Milan does not have to keep the flood gates closed to prevent the high water from entering its sewer system during non-flood stage periods." Compl. ¶ 28. The Corps was to recommence these efforts in fall or winter of 2013–2014, *id.* ¶ 29, and continue until funding was exhausted. Plaintiffs estimate that the effects of this action are temporary and will last between one and five years, at the end of which time sedimentation, logs, and beaver dams will cause Mill Creek to suffer from high water levels once more, in turn requiring Plaintiffs to keep the levee gates closed and

---

[3] It is unclear from the Complaint whether the Southwest STP discharges into the South Slough area, or the restored channel of Mill Creek that discharges into the Rock River. The "1930 Flood Damage Reduction Project Appraisal of Resumption of Operation and Maintenance Rock Island/Milan, Illinois," appended to the Complaint as Exhibit D, identifies a "Wastewater Treatment Plant" belonging to the City of Rock Island, located in the South Slough area. *See* Compl., Ex. D at 2, 13, 14.

submerging, or continuing to submerge, the Southwest Interceptor and water main. Various pollution scenarios at either STP, the Southwest Interceptor, or the water main would, Plaintiffs claim, result in violations, variously, of NPDES permits and municipal and Illinois law, which would result in violations of the Clean Water and Safe Drinking Water Acts.

On May 24, 2013, Plaintiffs filed the instant suit, seeking a permanent injunction compelling the Corps to maintain the Mill Creek South Slough.[4] In the motion now before the Court, Defendants move to dismiss the Complaint, or obtain judgment on the pleadings, on the basis of lack of subject matter jurisdiction. Defs.' Mot. Dismiss 1, ECF No. 10.

## DISCUSSION

### I. The Corps's Motion to Dismiss

Defendants argue that the Complaint should be dismissed because Plaintiffs have failed to establish standing, as they must for this Court to have subject matter jurisdiction. In the alternative, Defendants argue that this Court should enter judgment on the pleadings against Plaintiffs on all counts, because Plaintiffs' claims do not fall within any exceptions to the sovereign immunity of the United States. Because the Court finds that it lacks subject matter jurisdiction, it does not reach Defendants' remaining arguments.

### II. Legal Framework

A plaintiff has the burden of demonstrating that he has standing for each separate form of relief sought. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). To carry this burden a plaintiff must provide "competent proof" in support of the allegations, meaning that the

---

[4] The Complaint does not distinguish between MCSS Project property and easements in the South Slough and those on the portion of Mill Creek that was re-diverted to flow into the Rock River. Reference in the Complaint is continuously to "Mill Creek." The "1930 Flood Damage Reduction Project Appraisal of Resumption of Operation and Maintenance Rock Island/Milan, Illinois" states that "[f]loods in recent years near the outlet of Mill Creek into the Rock River are not associated with the MCSS as these two streams are no longer connected." Compl., Ex. D at 10.

plaintiff must show "by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Zamecnik v. Indian Prairie Sch. Dist. No. 207 Bd. of Educ.*, No. 07-cv-1586, 2009 WL 805654, at *1 (N.D. Ill. 2009) (quoting *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996)) (internal citations omitted). A court is "free to weigh the evidence to determine whether jurisdiction has been established." *Id.* (quoting *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012)).

In reviewing a motion to dismiss, a court must accept as true all well-pleaded facts in the complaint, and draw all reasonable inferences in favor of the plaintiff. *Scanlan v. Eisenberg*, 669 F.3d 838, 841 (7th Cir. 2012).

For this Court to have jurisdiction under Article III of the Constitution, the case before it must rise to the "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) that he has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Environmental Servs.*, 528 U.S. 167, 180–81 (2000).

When a plaintiff seeks injunctive relief, past or present injury in fact is insufficient for standing purposes: she must show she is "under threat of an actual and imminent injury in fact." *Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010). The injury must be "certainly impending"—"'[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S.Ct 1138, 1147 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158

(1990)) (emphasis in original). The "imminence" requirement ensures that the alleged injury is not too speculative. *Defenders of Wildlife* 504 U.S., at 565 n.2. The threat of injury is too speculative where "the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's control." *Id.*

Courts are limited to cases and controversies by Article III partly to limit their power to review actions taken by other branches of government:

> Article III of the Constitution restricts [the judicial power] to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violations of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action.

*Summers*, 555 U.S. at 492. Article III standing thus, among other functions, serves as a check on judicial overreach into regions properly entrusted to the legislative or executive branches. Article III "serves to prevent the judicial process from being used to usurp the power of the political branches." *Clapper*, 133 S.Ct. at 1146.

### III. Standing Analysis

In order to establish standing to seek an in injunction, a plaintiff must allege a threat of future injury in fact. *Schirmer*, 621 F.3d at 585. Harms Plaintiffs suffered in the past are therefore insufficient to support standing to seek an injunction. Pls.' Resp. to Mot. Dismiss 5, ECF No. 14 (claiming injuries such as "Milan has been injured by virtue of the need to pump water over the closed floodgates"). As for future harm, Plaintiffs fail to allege certainly impending injury in fact with respect to the Milan STP and to the Rock Island STP, Southwest Interceptor, and water main.

### A. Milan STP and the Levees

Plaintiffs claim that in 2011, the Corps undertook a "one-time action" to maintain the MCSS Project, and state that as a consequence of this action, the water level in Mill Creek has been lowered to the point where Milan does not have to keep the flood gates to Mill Creek closed. Compl. ¶ 28. However, Plaintiffs also claim that the Corps planned to re-commence work in fall or winter of 2013–2014, and continue "until the current funding is depleted." *Id.* ¶ 29. Thus, Plaintiffs assert, the Corps recommenced last fall or winter the work—maintaining the slough—that Plaintiffs wish them to continue permanently. The harm Plaintiffs seek to avert will follow one to five years after the Corps ceases to maintain the slough. *Id.* ¶ 30. Plaintiffs make no representation about how long the Corps is likely to be able to maintain the MCSS Project, or whether the Corps will seek or receive additional funding to do so. Rather, Plaintiffs argue that, "at some indefinite future time," *Defenders of Wildlife*, 504 U.S. at 565, n.2., the Corps will cease to maintain the South Slough, and years after that, flooding, high water level, and clogged drainage channels will again occur.

In other words, Plaintiffs will only be injured if a series of contingencies occur: (1) The Corps runs through the money already allocated, (2) does not acquire a new or different source of funding in the interim, (3) and ceases work on the MCSS Project. Next, (4) one to five years elapse without change in the Corps's funding or activity, (6) the levees are closed against rising water in Mill Creek, (7) and water backs up in Milan's sanitary sewer to the extent that (8) the Milan STP "hydraulically overload[s]." Compl. ¶ 32. Although Plaintiffs argue that closing the levees and pumping would amount to harm, the injuries they seek to enjoin against, and from which their cause of action arises, are the violations of the Clean Water and Safe Drinking Water

Acts that would flow only from the ultimate contingency, "hydraulic overload."[5] This injury only occurs if each of eight different contingencies—many or all determined by actors and forces outside of the Corps' control—fall exactly into place. In light of this chain of required contingencies and influence of outside forces, the likelihood that the predicted harms will occur is merely speculative. *See Defenders of Wildlife* 504 U.S., at 565, n.2. For the same reasons, it would be a stretch to find any such future injuries "fairly traceable" to the Corps' conduct. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

Furthermore, Plaintiffs do not overcome evidence in their own exhibits and pleadings supporting an inference that the Corps will continue to maintain the MCSS project area. The Corps's 2011 report ends by recommending "that maintenance of the MCSS channel should be resumed."[6] Compl., Ex. D at 43. As in *Clapper v. Amnesty International USA*, the final supposed harm alleged by Plaintiffs appears at the end of "a highly attenuated chain of possibilities," and is thus both too speculative to be certainly impending and not fairly traceable to Defendants' actions. *Clapper*, 133 S.Ct. at 1149.

The potential harm to the City of Milan and its STP also fail to confer Article III standing on Plaintiffs because the proposed injunction amounts to a proscribed "usurp[ation of] the powers of the political branches." *Clapper*, 133 S.Ct. at 1149; *see Summers*, 555 U.S. at 492–493. Effectively, Plaintiffs seek to enjoin Defendants to continue work, not just until funding for the project runs out, but indefinitely, whether or not funding has been approved by Congress. Plaintiffs seek by this means to enjoin, via judicial process, a permanent action by the executive

---

[5] Additionally, Plaintiffs do not explain why hydraulic overload and "discharge of inadequately treated sewage into the Rock River in violation of applicable effluent standards" would "likely" transpire if water backed up in the sanitary sewer system, as this has not occurred in the past. *See* Compl. ¶ 32.

[6] As noted *supra*, n.4, the Complaint does not appear to distinguish between Mill Creek, the waterway that discharges into the Rock River, and the MCSS Project channel in the South Slough, which is the topic of the Corps report attached to the Complaint as Exhibit D.

branch, in the form of the Corps, and the legislative branch, in the form of Congressional appropriation, where the forecasted harm is simply the future possibility of no government action being taken. Such review and revision of executive and legislative action, where no harm is clearly impending, is beyond the Constitutional limitations placed on the power of courts by Article III. *See Summers*, 555 U.S. at 492.

## B. Rock Island STP, the Southwest Interceptor, and Rock Island Water Main

Plaintiffs allege that 1,245 linear feet of the Southwest Interceptor are underwater as a consequence of the Corps's failure to perform maintenance on the MCSS Project. Compl. ¶ 40. Plaintiffs further state that the Interceptor is likely to break as a result of its submerged state, resulting in the release of 400,000 gallons of raw sewage per day and a violation of Rock Island STP's NPDES permit, the Illinois Environmental Protection Act, Illinois Pollution Control Board rules, and the Clean Water Act. *Id.* ¶ 43, 44, 76. Plaintiffs also allege that roughly two miles of water main is underwater because of the Corps's failure to perform maintenance work on the MCSS Project. *Id.* ¶ 103. Plaintiffs state that the water main is likely to break, require repair, result in pollution of drinking water, or result in disruption of drinking water service in the City of Rock Island. ¶¶ 105–112.

But, as already discussed, the Complaint states that the Corps performed maintenance work in 2011, *id.* ¶ 28, and planned to resume that work in the fall or winter of 2013–2014. *Id.* ¶ 29. If this maintenance work has not abated the conditions over the Interceptor and the water main—and the Complaint's use of the present tense to describe the submersion of the Southwest Interceptor and water main suggests that it has not—then there is no reason to believe the Corps will be able to alleviate this condition by continuing their "ineffective" maintenance activities, as requested by Plaintiffs. If, alternatively, the Corps's actions *have* alleviated the flooding of the

Southwest Interceptor, it is unclear both (1) why the Interceptor and water main are repeatedly depicted in the Complaint as being underwater and (2) what certainly-impending injury Plaintiffs seek to forestall by this Court's grant of a permanent injunction.

Assuming that Plaintiffs seek to forestall future flooding of the Southwest Interceptor and water main, they fail to establish "certainly impending" injury in fact for the same reason that the danger to the Milan STP is insufficiently imminent to furnish standing. The proposed injury depends upon a highly attenuated chain of contingencies: (1) The Corps runs through the money already allocated, (2) does not acquire a new or different source of funding in the interim, (3) and ceases work on the MCSS Project. Next, (4) one to five years elapse without change in the Corps's funding or activity, (6) water once more ponds over the Southwest Interceptor or water main, (7) a break in one of those mains occurs, and (8) a pollution event occurs in violation of municipal, state, or local law.[7] Only if all of these events occur as a consequence of each other could any violations of the CWA and CDWA fairly traceable to the Corps's actions result. This likelihood, like the likelihood of a malfunction at the Milan STP, is too remote to qualify as "certainly impending." *See Clapper* at 1147.

Plaintiffs argue in their Response that "where the statute in question proscribes both a particular action and the *threat* of such action, it is the imminence of the proscribed *threat* (not the threatened injury) that is considered for purposes of standing analysis," Resp. at 6, original emphasis, and rely on *Citizens for a Better Environment v. Caterpillar, Inc.*, 30 F.Supp.2d 1053, 1054-65 (CD. Ill. 1998) for the proposition that only the "threat" need be "certainly impending." *Id.* at 1064. Plaintiffs thus argue that an event with some remote possibility of occurrence is

---

[7] Additionally, the Court notes with interest that although not described therein as the "Southwest Interceptor," the Corps's report, Exhibit D, makes reference to an "underground sewer pipe," 1,245 feet of which is underwater. Compl., Ex. D at 29. The Corps report goes on to state that "[t]he sewer line has no history of breakages and has been excluded from this [extensive cost-benefit] analysis." *Id.*

"threatened" by virtue of its remote possibility of occurrence, and therefore a remote possibility of occurrence is a sufficiently concrete injury wherever a threat is itself proscribed by law. Whether a "threat" is "certainly impending," however, necessarily depends on the likelihood of the threatened event's occurrence. Here, the considerations that render the likelihood of Plaintiffs' predicted injuries too speculative—the attenuated causal chain and unpredictable decisions by outside actors—similarly provide no grounds for finding that even a threat of such injuries is imminent. *See Lujan*, 504 U.S. at 564, n.2 ("Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes.") The injuries postulated in the Complaint are too speculative for Article III purposes.

Accordingly, the Court finds that Plaintiffs lack standing to sue for injunctive relief, and as this is the only relief they seek, outside of related attorney's fees and costs, their Complaint must be dismissed.

**CONCLUSION**

Defendants' Motion to Dismiss, or, Alternatively, for Judgment on the Pleadings, ECF No. 10, is GRANTED. All claims against the United States of America, United States of America, Army Corps of Engineers, and Lieutenant General Thomas P. Bostick are dismissed. The Clerk is directed to close the case.

Entered this 24th day of September, 2014.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE